# IN THE SUPREME COURT OF IOWA

No. 14–1112

Filed April 8, 2016

Amended June 17, 2016

**STATE OF IOWA,**

Appellee,

vs.

**KENNETH OSBORNE ARY,**

Appellant.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Rebecca Goodgame Ebinger (pretrial motions) and Lawrence P. McLellan (trial), Judges.

The State seeks further review of a court of appeals decision reversing a defendant's criminal conviction. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH DIRECTIONS.**

Patrick W. O'Bryan, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Kelli Huser, Assistant Attorney General, John P. Sarcone, County Attorney, and Daniel Voogt, Assistant County Attorney, for appellee.

**WIGGINS, Justice.**

A defendant appealed his conviction following a jury trial on three counts of delivery of a controlled substance in violation of Iowa Code section 124.401(1)(*c*)(3) (2013). We transferred the case to the court of appeals. The court of appeals reversed the conviction on the ground the defendant's constitutional right to a fair trial by an impartial jury was violated when he was convicted by jurors who heard statements a prospective juror made during voir dire. The court of appeals thus remanded the case to the district court for a new trial without addressing the defendant's remaining claims. We granted the State's application for further review.

On further review, we conclude the district court did not deprive the defendant of an impartial jury or abuse its discretion by declining to hold a hearing to permit the defendant to show cause for missing an extended discovery and deposition deadline. In addition, we conclude we are unable to decide the defendant's claim of ineffective assistance of counsel. Finally, we agree with the State that the district court applied the wrong standard in ruling on the defendant's motion for new trial on the ground the verdicts were contrary to the weight of the evidence. Accordingly, we vacate the decision of the court of appeals, reverse the district court judgment on the motion for new trial on the ground the verdicts were contrary to the weight of the evidence, and remand the case with instructions. We affirm the district court judgment in all other respects.

## I. Background Facts and Proceedings.

A jury convicted Kenneth Osborne Ary of three counts of delivery of a controlled substance in violation of Iowa Code section 124.401(1)(*c*)(3)

on June 4, 2014. However, the claims before us on further review concern primarily the events leading up to his trial.

The State charged Ary with three counts of delivery of a controlled substance on October 28, 2013. On November 20, the district court arraigned Ary, scheduled a pretrial conference for December 19, and set trial for January 15. The court appointed counsel to assist him on November 25.[1]

During the pretrial conference on December 19, Ary waived his right to a speedy trial. The court also scheduled a second pretrial conference for February 12 and rescheduled trial for February 24. The same day, the court issued a pretrial conference order stating Ary must file any motions he wished to file within forty days of his arraignment. Because the court arraigned Ary on November 20, his deadline for taking depositions as of right expired December 20, and his deadline for filing pretrial motions other than motions in limine expired December 30. *See* Iowa Rs. Crim. P. 2.11(4), .13(6).

During the second pretrial conference on February 12, the court rescheduled trial for June 2. That day, the court also issued a status conference order indicating it would grant no additional continuances of the trial date assuming witness availability.

On February 25, Ary filed a handwritten pro se motion to produce. The court issued an order on March 6 stating it would withhold its ruling on the motion until defense counsel had an opportunity to consult with Ary.

On March 11, defense counsel filed a motion to produce and a motion for good cause for taking depositions past the required time. In

---

[1]We note Ary's appellate counsel did not serve as his trial counsel.

the latter motion, counsel acknowledged the deadline for taking depositions had expired December 20 and asserted taking depositions past the deadline would not prejudice or inconvenience the State. The State filed a response to the motion to produce on March 14, indicating it would provide mandatory discovery and permit discretionary discovery. But the State filed a resistance to the motion for good cause on April 11, arguing the motion for good cause for taking depositions past the required time set forth no good cause for the untimely filing of the deposition request or permitting late discovery of *any* type.

The court heard arguments on the pending motions on April 22. During the hearing, defense counsel pointed out that after the court appointed counsel to assist Ary on November 25, Ary had no opportunity to meet with or speak to his appointed counsel until December 19. Thus, Ary did not meet his appointed counsel until just before his deadline for taking depositions as a matter of right expired on December 20 and his deadline for filing pretrial motions other than motions in limine expired on December 30. *See id.* Counsel further noted that because his office had only recently assigned him to the case, he remained uncertain as to whether depositions were appropriate. However, counsel did not identify any caselaw suggesting these facts amounted to good cause for missing the deadline for filing a pretrial motion seeking discretionary discovery or the deadline for taking depositions.

The court concluded there was good cause to grant defense counsel one week to determine whether depositions were needed or further discovery was appropriate. The court ordered counsel to file written notice as to whether he needed to conduct depositions or further discovery by April 29. The court also reminded counsel the trial was still

set for June 2 and it would not grant any further continuances assuming witness availability. Finally, during the hearing and in a writing filed later the same day, Ary reasserted his right to a speedy trial.

The following day, the court issued a written order reiterating the April 29 deadline for filing the written notice. The order stated upon receipt of the notice, the court would promptly establish deadlines associated with any additional discovery sought.

On April 30, one day after the extended deadline expired, defense counsel filed a notice of intent to take depositions and seek discovery. Two weeks later, the court had not yet ruled as to whether it would permit further discovery. On May 14, defense counsel filed a motion to determine the status of the pending deposition and discovery requests. In the motion, defense counsel indicated he realized too late in the day on April 29 that he was unable to meet the extended deadline the court had set during the April 22 hearing. Defense counsel also acknowledged the State opposed the court granting the defendant leave to take depositions and seek further discovery due to this technical violation of the court order.

On May 23, the court denied the pending deposition and discovery requests and declined to extend the deadline or permit Ary to conduct depositions or seek further discovery.

Jury selection for the trial began on June 2. Early on during voir dire, the prosecutor questioned the prospective jurors about how they determine whether someone is telling the truth, asking, "Have you ever been in a position where someone has told you something and you had to decide whether you believe them or not?" Panel member J.W. raised his hand, and the prosecutor called on him. J.W. responded with the following information:

I'm a pastor, and I've dealt with all kinds of things with that. So, you know, there's people that are pretty good liars. And you know that they've done something and you—they're pretty good at spinning the truth, so to speak, you know. So I've dealt with a lot with people who, you know—you get a lot of people that come to your church and they're hurting, you know, and they have issues, whether it be with alcohol, drinking and getting in trouble driving or drugs and are selling drugs. I've dealt with that. Had a lot of people that I've dealt with that have gone to jail. I've got people that have been accused of stealing even to an amount of felony and somehow they spun their way out of it.

I told [fellow panel member J.K.] before I came in here I didn't know what the case was but I said, if it's involving drugs, I'd probably think the person is guilty and that's only because of my personal experience because I realize that a person has a right to defend themselves and go through the process, but I think I'm fairly prejudiced on this, any kind of a drug case with all of my experiences because even people that I know come from good families, they try to pretend they're innocent. I know the inside story, and I know they're not. So when it comes to this type of thing with Des Moines Police who arrest the person on drug charges, it appears there's guilt.

Another panel member, A.H., spoke up in response to J.W., admitting she had "the exact opposite prejudice" because she believed most drugs should be legal.

The prosecutor did not focus on what A.H. said. Instead, he turned back to J.W. and asked, "[W]hen you reach that conclusion in your own mind that this person has done something or they haven't, they're telling you the truth or they're not, how do you do that?" J.W. responded,

Well, I mean, you know, you talk to them, and, you know, you know—you're fairly certain what's going on.

Like, I'll give you an example. We had a student from the time they were in fifth grade, they were stealing, and I knew they were stealing, so I had to set them up. We had a little pop can to get pop, and we knew that—you're supposed to drop a buck in the refrigerator can and take the bottle. So this kid would come by and he would, you know, come out with the pop, and, you know, we kind of watched and we started noticing, we don't think he's paying for this. In fact,

we think he's taking money out of the can. So we marked the—we took the serial numbers off of a $5 bill before that afternoon when he got out of school, and this is right on his route home. So we dropped it in the can. So when he went in there, we went in behind him and, sure enough, the suspicion was true.

So all through the years he was always the one identifiable person constantly. Every time there was something missing—so the latest case was he was stealing from his mother. He stole from families in the church, and he denied it every time. He always spun it. And then he got down to where he took $1300. And he admitted it; went to court, got a little slap, nothing. And his mother was the one that turned him in and wished he'd have been sent off because she wants him out of the house. He's out of control, and he's just—you know, he's a kid that just spins stuff.

And so when you know a person or when you're around—when you work with people a lot, you can detect what's going on. I mean, I know that I'm bent, I'm prejudiced because I have never pastored a person that was accused of any type of drug possession, usage or delivery or selling that I didn't know that they were guilty, and I found out and knew they were guilty because I know the people that know them and know that they went—they spun their story. They got out of court. They didn't go to prison. They came back another time, spun out, didn't go to prison, and then finally, they ended up in jail and they served two terms or probably 20 some years, you know, because it got worse and got worse and got worse.

So I'm just telling you up front that I am—I—while I want to believe a person is innocent until proven guilty, I on the other hand don't think that drugs should be legalized because it destroys people. It's so addictive and it ruins their lives, so—and I've worked with too many people every day, day in, day out, so—I pastor over 5000 people, have a staff of ten pastors.

J.W. continued uninterrupted, explaining he was missing a funeral to be at the courthouse. He then concluded his response by bringing up the conversation he had with fellow panel member J.K. when the prospective jurors were lined up in the hallway waiting to enter the courtroom before jury selection began. He said,

So I'm out there telling her, I hope it's not a drug case because I'm going to go in there—we were laughing about it a

little bit because of my attitude. But it's not because I'm just a jerk. It's because of my experiences. I'm sorry. It's just— if there's a smoking gun, then there's a problem there.

The prosecutor responded to J.W.'s apology for his attitude toward those accused of drug-related crimes by reassuring him, "[T]here's nothing to be sorry about that."

A moment later, the prosecutor again asked J.W. how he forms an opinion as to whether a person is telling the truth:

[O]ne of the things that you told us was you may know the person or you may know people who know that person, or in the situation with the can, the pop can, the pop money, there were other facts that you believed that helped you confirm your suspicion. Is that right?

J.W. responded, "Right."

The prosecutor then directed the following comment to the entire panel:

So one of the points I wanted to raise is, while you all are fish out of water today and for the part of this process, these are the kinds of processes, the kinds of decisions, not the same decisions but the kinds of decisions that you make every day. It may be in an educational situation. It may be with your own children. It may be with people you pastor. It may be in the insurance business. Whatever the case may be, we make decisions using our brains in the same fashion. Different topics but the same kind of process.

Minutes later, the prosecutor turned to prospective juror A.H. and said,

So this is a drug case. And people have different views. [A.H.], I think you said that you believed—and I don't want to put words in your mouth, but you said some or most or some drugs anyway should be legal. Now [J.W.] or myself, if we were sitting around at Starbucks having a cup of coffee, may have a philosophical discussion with you about that. We may disagree.

A.H. nodded, and the prosecutor continued,

But this is a different context again. As of right now—and this particular case involves what's commonly called crack cocaine. But really, whether it's marijuana or some other drug, right now in the state of Iowa, you can't possess those

drugs; you can't use those drugs; you can't sell those drugs; you can't make those drugs. You understand that, right?

A.H. responded, "I understand." The prosecutor then asked A.H. if she could set aside her personal opinion and follow a jury instruction from the judge. A.H. indicated she would, but she added, "It would go against my conscience." When asked if she understood that jurors should not ignore the facts or the law in reaching a verdict, A.H. confirmed she did.

Following this exchange, the prosecutor explained to the jurors that ignoring the facts or the law in reaching a verdict is called jury nullification. In his words,

> Jury nullification involves jurors who believe because they're jurors they can disregard facts; they can disregard what the law is and just do whatever you want because you're a juror. That's not how we do it here. Does anybody feel that way, that's how they're going to handle a case like this, relating to the evidence?

J.W. immediately responded to the prosecutor's explanation:

> I'm not sure I understand your question. If you're asking the question whether or not I think that I could be impartial or the fact that I could know what the law is and what I'm supposed to do and actually be able to do that, I really—I do not think I can, I mean, honestly. And that's to be fair to the gentleman being accused in the sense that, you know, I'm going to have a very difficult time with that because I've never known anyone where—and, I mean, you know, a lot of situations.
>
> I mean, I'm 61. I've been in this thing for 40 years, and I've worked with lots and lots of people, and I've never known a case where someone was falsely accused of possession or using or delivery; never once when it wasn't true. Never.
>
> I have 20 law officers in my congregation. And, you know, Mark Wilson, wore [a badge] for years, my best friend. And I don't—I just have to say that I'm really going to have a hard time because I know the evidence is going to be both sides, and I'm going to be bent toward hearing the State. And that's fine, I'll do it, but I'm just telling you. This same kid, last Saturday, stole from his best friend's grandmother 60 bucks out of her purse. That's the type of thing I'm talking

about. When they get off and they get off and they get off and they spin off, technicality, they're right back at it again.

Everyone that ever got off of a drug charge was right back out and doing it, and they never learned. And I don't know what the answer is because I'm not sure putting people in jail over drug charges, at least doing—you know, actually using the drugs, but when you're delivering it or making it or selling it is a different program.

When J.W. finished speaking, the prosecutor explained to him the jurors would only determine whether the defendant was guilty, not what the punishment was. J.W. responded by saying, "I don't even know the law. I don't know what would happen; but one thing I've witnessed is an awful lot of guilty people that get off."

The prosecutor then called on A.H., who had raised her hand to explain her "main objection" to the illegality of drugs was that "the legal ramifications" of drug convictions are devastating and "sometimes more troublesome than the actual symptoms of some drugs that people do." Before A.H. finished speaking, J.W. interrupted, saying,

Excuse me. But the other side of that is kids who are being given stuff and influenced with stuff, good kids from good families that get ruined by people who pedal this for their profit. That's an issue, and that's why I think the law has to be stiff on this thing.

The prosecutor thereafter explained the concept of the burden of proof to the panel. After distinguishing between the concept of the burden of proof and the reasonable-doubt standard the impaneled jurors would have to apply, the prosecutor asked the panel members what they think of when they hear the phrase "beyond a reasonable doubt." The prosecutor called on one prospective juror, who expressed the opinion that the phrase means "you can't have any doubt in your mind whatsoever" to find a defendant guilty of a crime. The prosecutor next called on J.W., who explained his contrary view as follows: "Reasonable.

Reasonable doubt. Not absolute, certain, totally positive, convinced 100 million percent, because nobody would ever be found guilty. Because unless I was there and saw him, I couldn't find him guilty in this case."

Minutes later, the court recessed for a lunch break. After the prospective jurors departed from the courtroom, defense counsel moved to disqualify the entire jury panel, arguing J.W.'s statements had tainted the other prospective jurors and prejudiced them against Ary. The prosecutor resisted the motion, arguing there was no evidence J.W. had tainted the panel and no basis to discharge the entire panel or declare a mistrial. The judge denied the motion, acknowledging J.W. made a number of comments but concluding they had not tainted the panel to the point that the court was required to grant a mistrial.

After counsel and the judge returned from lunch, defense counsel moved to strike J.W. for cause outside the presence of the panel. The judge responded,

> [Defense counsel] must have been reading my mind over the noon hour because I had some concerns with regard to [J.W.'s] comments. While I denied the motion for mistrial, I am concerned that what he might say this afternoon that that may go beyond where he is today in his comments and may taint the jury pool with comments later this afternoon.

In light of his concern that J.W. might say something that would taint the other prospective jurors during the remaining voir dire of the panel, the judge agreed to bring J.W. into the courtroom so counsel could question him outside the presence of the other panel members.

During individual voir dire, J.W. once again discussed his conversation with fellow panel member J.K. outside the courtroom. After several minutes of questioning, the judge granted defense counsel's motion to strike J.W. for cause outside the presence of the panel.

The prosecutor then asked to conduct individual voir dire on several other prospective jurors based on responses to questions appearing on their juror questionnaires. Specifically, the prosecutor requested individual voir dire with one prospective juror who had suffered multiple head traumas, three prospective jurors who had prior convictions, one prospective juror who had a connection to another pending case, and one prospective juror whose family member had testified in a murder trial. Additionally, the prosecutor requested individual voir dire with prospective jurors A.H. and J.K. The court granted all the prosecutor's requests for individual voir dire with particular panel members.

During individual voir dire with prospective juror J.K., the prosecutor asked her whether the comments J.W. made outside the courtroom might affect her ability to be a fair and impartial juror. J.K. answered they would not. At no other point during jury selection did the prosecutor or defense counsel ask any other prospective juror whether any of the statements J.W. made might affect his or her ability to be fair or impartial. Defense counsel never requested individual voir dire with any of the prospective jurors to explore whether the statements J.W. made might influence them in any way.

Once counsel completed the individual voir dire, the judge summoned all the prospective jurors back into the courtroom, and the prosecutor resumed voir dire of the entire panel. Shortly thereafter, the prosecutor moved to remove A.H. for cause in the presence of the remaining panel members. The judge granted the motion, also in the presence of the other panel members. Defense counsel never asked the court to inform the panel it dismissed J.W. for cause during individual voir dire.

Once the prosecutor finished questioning the panel members, the judge gave defense counsel an opportunity to do so. Counsel then exercised their strikes and selected the panel members who would serve on the jury. The impaneled jurors included just three people questioned during individual voir dire, including J.K. None of the impaneled jurors other than J.K. were ever asked by defense counsel whether they could be impartial or whether any of the statements J.W. made might affect their ability to be impartial.

Over two days of trial, the jurors heard testimony by eight Des Moines police officers and a confidential informant. The jury returned guilty verdicts on each of the three counts of delivery of a controlled substance with which the State had charged Ary, each count relating to one of three controlled drug buys the testimony indicated the confidential informant had completed for the officers in the fall of 2013.

Before his sentencing, Ary filed a combined motion for a new trial and motion in arrest of judgment requesting the court to order a new trial. In the motion, Ary argued the verdicts were contrary to the evidence and asserted a structural error had deprived him of a fair and impartial trial. *See id.* 2.24. In addition, Ary asserted the court erroneously denied the motion he lodged during voir dire seeking dismissal of the entire jury panel due to the statements J.W. made. In support of this claim, defense counsel cited *Mach v. Stewart,* a case in which the Ninth Circuit Court of Appeals concluded impaneling jurors who heard a prospective juror's expert-like statements during voir dire violated a defendant's right to an impartial jury under the Sixth Amendment to the United States Constitution. 137 F.3d 630, 633 (9th Cir. 1997).

The court denied the motion for a new trial on the ground the verdicts were contrary to the weight of the evidence, concluding the jury had been presented with sufficient evidence to support a guilty verdict on each of the three delivery counts. The court also denied the motion for new trial on the ground it deprived Ary of his right to an impartial jury by impaneling jurors who heard the statements J.W. made.

Ary appealed, advancing the following arguments. First, Ary contended the court erroneously denied his right to an impartial jury under article I, section 10 of the Iowa Constitution and the Sixth Amendment to the United States Constitution because the statements J.W. made during jury selection had tainted the entire jury panel. Second, Ary argued the court abused its discretion by denying his deposition and discovery requests without conducting a hearing to permit defense counsel to show cause for his failure to meet the deadline the court set for filing the notice of intent to take depositions and seek discovery. Third, Ary claimed he received ineffective assistance of counsel because his counsel filed the notice of intent to take depositions and seek discovery after the deadline for doing so had expired. Finally, Ary argued the court erroneously applied the sufficiency-of-the-evidence standard rather than the weight-of-the-evidence standard in denying his motion for new trial on the ground the verdicts were contrary to the evidence.

We transferred the case to the court of appeals. The court of appeals reversed the conviction and remanded the case to the district court for a new trial, concluding the district court had failed to take adequate curative measures to ensure the impartiality of the prospective jurors following the statements J.W. made during voir dire. Accordingly, the court of appeals declined to address Ary's remaining claims.

The State filed an application for further review, which we granted.

**II. Issues.**

The issues we consider in this appeal are as follows. First, whether the district court denied Ary a fair trial by an impartial jury. Second, whether the district court abused its discretion by declining to set a hearing to permit defense counsel to show cause for missing the extended discovery and deposition deadline. Third, whether Ary received ineffective assistance of counsel when defense counsel filed the notice of intent to take depositions and seek discovery after the deadline the district court set for doing so had expired. Fourth, whether the district court erroneously applied the incorrect standard in denying Ary's motion for new trial on the ground the verdicts were contrary to the weight of the evidence.

**III. Whether the District Court Denied Ary a Fair Trial By an Impartial Jury.**

**A. Standard of Review.** During voir dire, defense counsel moved to disqualify the entire jury panel on the ground the statements J.W. made prejudiced the other prospective jurors against Ary. The district court concluded it was not obligated to grant the motion and denied it. Because there was no procedural basis on which the court might have been obligated to grant the motion, the constitutional basis for the claim was obviously apparent. Accordingly, Ary has properly preserved both his federal and state constitutional claims. *See In re Det. of Hodges*, 689 N.W.2d 467, 469–70 (Iowa 2004); *State v. Hernandez-Lopez*, 639 N.W.2d 226, 233 (Iowa 2002).

Ary contends the standard of review for his claim that the court denied him a fair trial by an impartial jury is de novo. In its brief on appeal, the State conceded the standard of review for this claim is

de novo. In its application for further review, however, the State argues the proper standard is abuse of discretion. We have previously considered claims arising in similar circumstances under both standards of review. *Compare State v. Gavin*, 360 N.W.2d 817, 818 (Iowa 1985), *with State v. Staker*, 220 N.W.2d 613, 617 (Iowa 1974). Because we conclude we would reach the same conclusion applying either standard of review, we need not decide which standard applies.

To preserve error on a constitutional claim, counsel should inform the district court of the constitutional basis for any motion a party makes. When a party raises only a specific *federal* constitutional basis for a claim in district court and does not raise the question of ineffective assistance of counsel on appeal, the parallel state constitutional question is not preserved. *State v. Prusha*, 874 N.W.2d 627, 630 (2016). However, when a party does not indicate the specific constitutional basis for a claim to which parallel provisions of the federal and state constitutions apply, we regard both the federal and state constitutional claims as preserved. *State v. DeWitt*, 811 N.W.2d 460, 467 (Iowa 2012); *State v. Harrington*, 805 N.W.2d 391, 393 n.3 (Iowa 2011); *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011). When counsel does not advance a distinct analytical framework under a parallel state constitutional provision, we ordinarily exercise prudence by applying the federal framework to our analysis of the state constitutional claim, but we may diverge from federal caselaw in our application of that framework under the state constitution. *See In re Det. of Matlock*, 860 N.W.2d 898, 903 (Iowa 2015); *State v. Short*, 851 N.W.2d 474, 491 (Iowa 2014); *State v. Baldon*, 829 N.W.2d 785, 822–23 (Iowa 2013) (Appel, J., concurring specially); *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009); *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 6–7 (Iowa 2004).

Because Ary did not advance a distinct analytical framework for his claim under article I, section 10 of the Iowa Constitution, we apply the federal framework applied to claims under the Sixth Amendment to the United States Constitution in considering his state constitutional claim.

**B. Analysis.** "Unquestionably, a person accused of committing a crime has a fundamental right to a fair trial by an impartial jury whose determination of guilt or innocence is based exclusively on evidence admitted at trial." *State v. Frank*, 298 N.W.2d 324, 326 (Iowa 1980). The right to a criminal trial by an impartial jury is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 9 and 10 of the Iowa Constitution. *See State v. Walters*, 426 N.W.2d 136, 138 (Iowa 1988). The right to a fair trial by an impartial jury is an essential requirement of due process. *State v. Siemer*, 454 N.W.2d 857, 861 (Iowa 1990). However, as the United States Supreme Court has acknowledged,

> Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.

*United States v. Wood*, 299 U.S. 123, 145–46, 57 S. Ct. 177, 185, 81 L. Ed. 78, 88 (1936).

Ary asserts the statements J.W. made during voir dire mirror those the Ninth Circuit relied upon to conclude a trial court violated a defendant's right to an impartial jury in *Mach*. 137 F.3d at 631–33. In that case, the Ninth Circuit considered a petition for habeas corpus filed by a defendant convicted of sexual conduct with a minor. *Id.* at 631. The defendant claimed a biased jury convicted him because an exchange

between the trial judge and a potential juror during voir dire "impermissibly tainted the jury pool to the extent that the court should have granted a mistrial." *Id.* at 632. The potential juror who participated in the exchange was a social worker employed by child protective services. *Id.*

The exchange began when the potential juror told the judge "she would have a difficult time being impartial given her line of work, and that sexual assault had been confirmed in every case in which one of her clients reported such an assault." *Id.* The judge continued questioning the potential juror in front of the entire jury panel, thereby eliciting three additional statements from her "that she had never, in three years in her position, become aware of a case in which a child had lied about being sexually assaulted." *Id.* The judge also elicited statements from the potential juror indicating "she had taken child psychology courses and worked with psychologists and psychiatrists" and "worked with children as a social worker for the state for at least three years." *Id.* at 633.

At one point, the judge warned the potential juror who made the statements that she would have to determine whether the defendant was guilty based on the evidence presented at trial if she served on the jury. *Id.* When asked if she could do that, the potential juror stated she "probably" could. *Id.* at 632. Nonetheless, she went on to make another statement indicating "she had never known a child to lie about sexual abuse." *Id.* at 633. The judge then asked the other potential jurors if any of them disagreed with that statement, and not a single potential juror responded. *Id.* When the defendant moved for a mistrial on the ground the entire panel had been tainted by the exchange, the court denied the motion but struck the social worker for cause. *Id.* at 632.

The Ninth Circuit applied the following standard to determine whether the court violated the defendant's right to a fair trial by an impartial jury under the federal constitution:

> The Sixth Amendment right to jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." "Even if 'only one juror is unduly biased or prejudiced,' the defendant is denied his constitutional right to an impartial jury." Due process requires that the defendant be tried by a jury capable and willing to decide the case solely on the evidence before it.

*Id.* at 633 (citations omitted) (first quoting *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642, 6 L. Ed. 2d 751, 755 (1961); then quoting *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979)). Applying this standard, the Ninth Circuit concluded that following the motion for mistrial, at a minimum the judge "should have conducted further voir dire to determine whether the panel had in fact been infected" by the social worker's expert-like statements. *Id.* Because the judge conducted no additional voir dire to determine whether the statements affected the other potential jurors, the Ninth Circuit presumed the statements had biased at least one juror who convicted the defendant in violation of his right to an impartial jury. *Id.*

We find the voir dire in this case to be distinguishable from the voir dire conducted in *Mach*. In *Mach*, neither the trial judge nor counsel conducted voir dire to determine what effect, if any, the statements the potential juror made might have had on the other potential jurors. In contrast, the district court judge in this case acknowledged the statements J.W. made could have affected the other panel members and allowed counsel from both sides the opportunity to question the other panel members individually to determine whether the statements had in

fact infected them. The subsequent individual voir dire revealed no bias on the part of the other panel members.

Expressions of bias or prejudice by a single prospective juror *ordinarily* do not constitute a sufficient ground for disqualification of an entire jury panel. *Staker*, 220 N.W.2d at 616. However, we acknowledge "remarks made during voir dire *could* become so inflammatory and potentially prejudicial that an entire panel could be disqualified." *State v. Misner*, 410 N.W.2d 216, 220 (Iowa 1987) (emphasis added). Nonetheless, the statements J.W. made in the presence of the other prospective jurors in this case did not reference the defendant, convey personal knowledge of the underlying facts at issue, or relay objective data that might otherwise bear on the case. Considered in context, we think it was clear that J.W. was expressing his strong personal opinions regarding persons accused of drug crimes, not relaying objective data concerning their credibility or likelihood of guilt. Under these circumstances, we decline to presume the statements the prospective jurors heard during voir dire affected their ability to be impartial.

Finally, we note we are unable to tell from the record whether defense counsel was satisfied the statements J.W. made did not taint the other prospective jurors or whether he was simply ineffective. At no point during the initial voir dire of the entire jury panel did defense counsel ask to approach the bench or move to strike J.W. for cause. Rather, he moved to disqualify the entire panel only after the court recessed for lunch and moved to strike J.W. for cause just before voir dire resumed. In addition, at no point did defense counsel request individual voir dire with the other prospective jurors to determine whether J.W.'s statements might affect their ability to be impartial.

Notwithstanding these failures, defense counsel had the opportunity at least to begin exploring whether the statements might have affected the other prospective jurors when the court granted the prosecutor's request to question eight panel members individually. But defense counsel declined to ask any of those panel members whether the statements J.W. made might influence them in any way. Similarly, once the court reconvened the entire panel, defense counsel did not ask the court to inform the panel it dismissed J.W. for cause during individual voir dire or ask the panel members whether the statements J.W. made might affect them.

Had defense counsel requested the court to intervene sooner or by different means, the court could have struck J.W. for cause before he made some of the concerning statements, issued a cautionary or curative instruction to the panel, or permitted counsel to individually question every panel member to ensure the statements did not affect them. *See, e.g., United States v. Lussier*, 423 F.3d 838, 840 (8th Cir. 2005).

Similarly, had defense counsel taken advantage of readily available avenues for exploring whether the statements affected the other panel members, he might have been able to discern whether the statements actually had any impact. The purpose of voir dire is to give counsel an opportunity to discover information that may be useful in exercising peremptory strikes and challenging jurors for cause, thereby ensuring the selection of jurors who will consider the facts presented during trial fairly and impartially. *See State v. Tubbs*, 690 N.W.2d 911, 915 (Iowa 2005); *State v. Proctor*, 585 N.W.2d 841, 844–45 (Iowa 1998); *see also Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S. Ct. 1899, 1908, 114 L. Ed. 2d 493, 509 (1991). However, voir dire cannot serve its purpose effectively in the absence of effective counsel.

Accordingly, we conclude the statements J.W. made during voir dire were not so prejudicial as to warrant a presumption they tainted at least one member of the jury panel. We find no basis for reversing the conviction based on the district court's denial of Ary's motion to disqualify the entire jury panel or a violation of his right to a fair trial by an impartial jury.

**IV. Whether the District Court Abused Its Discretion by Declining to Hold a Hearing to Allow Ary to Show Cause For Missing the Extended Deadline Set by the District Court.**

**A. Standard of Review.** We review district court rulings denying an extension of a discovery deadline for an abuse of discretion. *Nedved v. Welch*, 585 N.W.2d 238, 239 (Iowa 1998). The State contends Ary did not preserve error as to this claim because Ary never asserted good cause for missing the deadline before the district court. For purposes of our analysis, we assume without deciding Ary preserved error. *See State v. Clark*, 814 N.W.2d 551, 563 & n.8 (Iowa 2012).

**B. Analysis.** Discovery matters are ordinarily committed to the sound discretion of the trial court. *State v. Gates*, 306 N.W.2d 720, 725 (Iowa 1981). We will find a discovery ruling indicates an abuse of discretion only when it reflects an exercise of discretion on grounds clearly untenable or to an extent clearly unreasonable. *Nedved*, 585 N.W.2d at 239–40. The party challenging the district court's administration of the discovery rules has the burden to prove an abuse of discretion occurred. *State v. Grimme*, 338 N.W.2d 142, 144 (Iowa 1983). Reversal on the ground the district court abused its discretion in ruling on a discovery matter is appropriate only if the party challenging the ruling demonstrates the abuse of discretion prejudiced the substantial rights of the defendant. *Gates*, 306 N.W.2d at 725.

The Iowa Rules of Criminal Procedure require a defendant to file a request for discovery "no later than 40 days after arraignment." Iowa R. Crim. P. 2.11(4); *see State v. Ortiz*, 766 N.W.2d 244, 250 (Iowa 2009). Thus, a defendant's failure to file a discovery request by this deadline generally constitutes a waiver of his or her right to depose witnesses or seek discovery, "but the court, for good cause shown, may grant relief from such waiver." Iowa R. Crim. P. 2.11(3). Similarly, the rules permit a defendant to depose State witnesses within thirty days of arraignment as of right, but the district court may extend that deadline for good cause shown. *Id.* r. 2.13(1), (6); *Grimme*, 338 N.W.2d at 145.

Because the court arraigned Ary on November 11, he was entitled to take depositions as of right until December 20 and file discretionary discovery requests until December 30. Nevertheless, Ary did not file his pro se motion to produce until February 25, and his counsel did not file the motion to produce and motion for good cause for taking depositions past the required time until March 11. During a hearing on April 22, the district court in its discretion found good cause existed to grant defense counsel one week to determine whether Ary would seek depositions or additional discovery.

Despite the April 29 deadline, defense counsel did not file a notice of intent to take depositions and seek discovery until April 30. At that time, defense counsel did not acknowledge the untimely filing in any way before or after filing the notice, despite the looming trial date and the court's stated intention to promptly establish further discovery deadlines upon its receipt. In fact, defense counsel only acknowledged the untimely filing when he sought clarification regarding the status of the pending deposition and discovery requests on May 14, at which time he made no effort to show good cause for missing the extended deadline or

provide the court with any specific information regarding the discovery or depositions sought. By that point, the trial date was less than three weeks away, and the State opposed granting the pending requests.

When the district court denied the pending deposition and discovery requests on May 23, it emphasized defense counsel did not request an extension of the April 29 deadline, bring the untimeliness of the filing to the attention of the court, or show good cause to excuse the untimeliness. The court further emphasized defense counsel failed to specify the particular individuals Ary intended to depose or what additional discovery he sought in the notice even though Ary had reasserted his right to a speedy trial. Accordingly, the court declined to exercise its discretion to further extend the discovery and deposition deadlines or set a hearing to allow Ary to show good cause for missing the April 29 deadline.

We note defense counsel could have filed the notice of intent to take depositions and seek discovery with a judge in the evening after hours. *Cf.* Iowa R. Civ. P. 1.442(5). Short of that, counsel should have forthrightly informed the judge of his failure to meet the deadline the following day when he filed the notice at 8:30 a.m. Instead, he waited weeks before acknowledging the missed deadline in a status request.

We also note defense counsel had reason to know the court would be hesitant to extend the April 29 deadline. During the hearing in which the district court set that deadline, counsel requested two weeks to determine whether to take depositions or seek additional discovery. Yet the court granted only one week and warned it would not continue the trial to permit further depositions or discovery.

Notwithstanding this warning, counsel waited until the last moment to assess whether further discovery or depositions would aid Ary

in his defense and provided the court no information to help it establish additional deadlines in either the notice or the status request. When counsel finally acknowledged the late filing in the status request, the only explanation he cited for its untimeliness was his own failure to realize the deadline had arrived until it was too late to submit the notice in a timely manner. We do not find this to be good cause.

Because defense counsel missed a deadline the district court had already extended and failed to bring the late filing to its immediate attention despite the defendant's reassertion of his right to a speedy trial, we conclude the court did not abuse its discretion by failing to permit defense counsel to show good cause for missing the April 29 deadline. *See Clark*, 814 N.W.2d at 563–64. "While we might not have made the same call had the decision been ours, we cannot say it was an abuse of discretion." *Id.* at 564.

However, we caution that in exercising their discretionary authority over the administration of discovery matters, "courts must strike a careful balance between the interest in economizing discovery and the rights afforded criminal defendants." *Gates*, 306 N.W.2d at 726. Furthermore, we note the State shares with every criminal defendant an interest in the fair and accurate adjudication of his or her criminal proceeding. *See Ake v. Oklahoma*, 470 U.S. 68, 79, 105 S. Ct. 1087, 1094, 84 L. Ed. 2d 53, 63–64 (1985). Ever mindful of the delicate decisions courts must make in administering discovery in criminal cases, the professional civility demanded of their profession, and this shared interest, we anticipate that prosecutors shall continue to refrain from opposing generous administration of the discovery deadlines set forth in our criminal procedural rules absent extraordinary circumstances.

**V. Whether Ary Received Ineffective Assistance of Counsel When His Counsel Missed the Deadline the District Court Had Set for Filing the Notice of Intent to Take Depositions and Seek Discovery.**

**A. Standard of Review.** Because a claim counsel was ineffective implicates the constitutional right to effective assistance of counsel, we review such claims de novo. *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012).

**B. Analysis.** Ary claims his trial counsel was constitutionally ineffective because he filed the notice of intent to take depositions and seek discovery after the extended deadline set by the district court had expired even though Ary had clearly expressed his desire to take depositions and seek additional discovery. To prevail on a claim of ineffective assistance of counsel, the claimant must show counsel failed to perform an essential duty and prejudice resulted. *Id.* at 495 (describing the test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984)). We resolve a claim of ineffective assistance of counsel on direct appeal only when the record is adequate. *Id.* at 494.

Under the first prong of the *Strickland* test, we presume counsel performed competently unless the claimant proves by a preponderance of the evidence counsel failed to perform an essential duty. *Id.* at 495. In deciding whether counsel failed to perform an essential duty, we measure counsel's performance against prevailing professional norms, including those reflected in standards set by the American Bar Association and our ethical rules. *Id.* at 495–96.

We conclude Ary demonstrated his trial counsel failed to perform an essential duty. Our rules of professional conduct require lawyers to "act with reasonable diligence and promptness in representing a client."

Iowa R. Prof'l Conduct 32:1.3. A lawyer who neglects to file documents with the court in a timely manner without an adequate excuse violates this rule. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Mendez*, 855 N.W.2d 156, 170 (Iowa 2014). When counsel finally acknowledged he did not file the notice of intent to take depositions and seek discovery in a timely manner, he merely asserted he realized the extended deadline had arrived too late in the day to file the notice on time.

Though we acknowledge counsel was unable to file the notice electronically because this case still had a paper file, we find this excuse to be unpersuasive. Counsel did not include the information the district court needed to promptly establish further discovery deadlines or find good cause for the late filing in the untimely notice. Nor did counsel request an extension of the deadline or immediately bring the late filing to the attention of the court. In light of the approaching trial date and the court's warning that it would not grant a continuance to permit depositions or discovery, there can be no question that these failures collectively amounted to a failure to perform an essential duty.

To satisfy the second prong of the *Strickland* test, the claimant must prove by a reasonable probability that, but for counsel's failure to perform an essential duty, the result of the proceeding would have been different. *Clay*, 824 N.W.2d at 496. This does not require the claimant to establish counsel's conduct "more likely than not altered the outcome in the case." *State v. Graves*, 668 N.W.2d 860, 882 (Iowa 2003) (quoting *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2068, 80 L. Ed. 2d at 697). Rather, the claimant need only show the probability of a different result is "sufficient to undermine [our] confidence in the outcome" of the trial. *Id.* (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698). "In determining whether this standard has been met, we must

consider the totality of the evidence, what factual findings would have been affected by counsel's errors, and whether the effect was pervasive or isolated and trivial." *Id.* at 882–83.

We conclude the record is inadequate to assess whether prejudice resulted from trial counsel's breach of an essential duty on direct appeal. In his brief, Ary argues deposing the State's witnesses would have generally aided his defense and allowed him to impeach them more effectively at trial. Nevertheless, we conclude it is unclear from the record whether counsel's failure to perform an essential duty might have resulted in a different outcome at trial. *See Clay*, 824 N.W.2d at 496. Therefore, Ary may bring his ineffective-assistance claim in a future postconviction relief action.

**VI. Whether the District Court Erroneously Applied the Incorrect Standard in Denying Ary's Motion For New Trial on the Ground the Verdicts Were Contrary to the Weight of the Evidence.**

**A. Standard of Review.** A district court should grant a motion for a new trial only in exceptional circumstances. *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998). We generally review rulings on motions for new trial asserting a verdict is contrary to the weight of the evidence for an abuse of discretion. *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006). However, we review a claim that the district court failed to apply the proper standard in ruling on a motion for new trial for errors at law. *State v. Wells*, 738 N.W.2d 214, 218 (Iowa 2007) (citing former Iowa Rule of Appellate Procedure 6.4, now rule 6.907).

**B. Analysis.** Ary claims the district court erroneously applied the sufficiency-of-the-evidence standard rather than the weight-of-the-evidence standard in denying his motion for new trial. The State agrees the court applied the incorrect standard in ruling on the motion.

Iowa Rule of Criminal Procedure 2.24(2)(*b*)(6) permits a district court to grant a motion for new trial when a verdict is contrary to the weight of the evidence. *Ellis*, 578 N.W.2d at 657–59 (describing the standard applicable to motions brought under former Iowa Rule of Criminal Procedure 23(2)(*b*)(6), now rule 2.24(2)(*b*)(6)). A verdict is contrary to the weight of the evidence only when "a greater amount of credible evidence supports one side of an issue or cause than the other." *Shanahan*, 712 N.W.2d at 135 (quoting *Ellis*, 578 N.W.2d at 658).

The weight-of-the-evidence standard requires the district court to consider whether more "credible evidence" supports the verdict rendered than supports the alternative verdict. *Ellis*, 578 N.W.2d at 658–59. It is broader than the sufficiency-of-the-evidence standard in that it permits the court to consider the credibility of witnesses. *State v. Nitcher*, 720 N.W.2d 547, 559 (Iowa 2006). Nonetheless, it is also more stringent than the sufficiency-of-the-evidence standard in that it allows the court to grant a motion for new trial only if more evidence supports the alternative verdict as opposed to the verdict rendered. *Nguyen v. State*, 707 N.W.2d 317, 327 (Iowa 2005). The question for the court is not whether there was sufficient credible evidence to support the verdict rendered or an alternative verdict, but whether "a greater amount of credible evidence" suggests the verdict rendered was a miscarriage of justice. *Ellis*, 578 N.W.2d at 658–59.

In contrast to a motion for new trial brought under the sufficiency-of-the-evidence standard, a motion for new trial brought under the weight-of-the-evidence standard essentially concedes the evidence adequately supports the jury verdict. *State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003). Consequently, a district court may invoke its power to grant a new trial on the ground the verdict was contrary to the weight of

the evidence only in the extraordinary case in which the evidence preponderates heavily against the verdict rendered. *State v. Maxwell*, 743 N.W.2d 185, 193 (Iowa 2008); *Shanahan*, 712 N.W.2d at 135.

The district court judge denied Ary's motion for new trial at the beginning of his sentencing hearing. In ruling on the motion, the judge stated,

> With regard to your motion as to whether the evidence is sufficient, I believe the evidence was sufficient for the jury to convict on all three counts that they rendered a verdict on. I think there was sufficient evidence in the record the State presented; and so I'm going to deny the motion for new trial and for arrest of judgment on that basis.

In its sentencing order, the court indicated the reasons for its denial of the motion for new trial were those stated on the record during the sentencing hearing.

We agree with the parties that the district court erroneously applied the sufficiency-of-the-evidence standard rather than the weight-of-the-evidence standard in ruling on the motion for new trial on the ground the verdicts were contrary to the weight of the evidence. Appellate review of a district court ruling on a motion for new trial asserting the verdict was contrary to the weight of the evidence ordinarily does not extend to "the underlying question of whether the verdict is against the weight of the evidence." *See State v. Taylor*, 689 N.W.2d 116, 134 (Iowa 2004) (quoting *Reeves*, 670 N.W.2d at 203). Therefore, we reverse the district court ruling on the motion for new trial on the ground the verdicts were contrary to the weight of the evidence and remand the case to the district court to apply the correct standard in considering the motion.

**VII. Summary and Disposition.**

We conclude the district court did not deprive Ary of an impartial jury or abuse its discretion by declining to hold a hearing to permit defense counsel to show cause for missing the extended discovery and deposition deadline. Although Ary established defense counsel breached an essential duty, on this record we are unable to decide his claim of ineffective assistance of counsel.

We further conclude the district court applied the incorrect standard in ruling on Ary's motion for new trial on the ground the verdicts were contrary to the weight of the evidence. Accordingly, we vacate the decision of the court of appeals, reverse the district court judgment on the motion for new trial on the ground the verdicts were contrary to the weight of the evidence, and remand the case to the district court. On remand, the district court should apply the weight-of-the-evidence standard to rule on the motion for new trial on the ground the verdicts were contrary to the weight of the evidence. *See Ellis*, 578 N.W.2d at 659 (remanding solely to allow the district court to apply the weight-of-the-evidence standard in ruling on a motion for new trial). We affirm the district court judgment in all other respects.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH DIRECTIONS.**